07 CIV 5646

JUDGE CHIN

DAVIS & GILBERT LLP
Howard J. Rubin (HR 1768)
Jennifer Tafet Klausner (JK 1413)
Allie Lin (AL 4067)
1740 Broadway
New York, New York 10019
(212) 468-4800

Attorneys for Plaintiff
PENN, SCHOEN & BERLAND ASSOCIATES, LLC



RECEIVED
JUN 1 3 2007
U.S.D.C. S.D. N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PENN, SCHOEN & BERLAND ASSOCIATES, LLC,

　　　　　　　　　Plaintiff,

　　-against-

MICHAEL J. BERLAND, MITCHELL E. MARKEL, JULIE BISSELL, JENNIFER NEGRIN and GLOBAL INSIGHTS & STRATEGIES, LLC,

　　　　　　　　　Defendants.

07 Civ. _____

**COMPLAINT**

　　　　Plaintiff, Penn, Schoen & Berland Associates, LLC ("PSB"), by its attorneys, Davis & Gilbert LLP, for its Complaint against defendants Michael J. Berland ("Berland"), Mitchell E. Markel ("Markel"), Julie Bissell ("Bissell") and Jennifer Negrin ("Negrin"), (together, the "Individual Defendants") and Global Insights and Strategies, LLC ("Insights & Strategies") (collectively, "Defendants"), states as follows:

## NATURE OF THE ACTION

1.     PSB brings this action to stop Defendants from engaging in an orchestrated and illegal plot to sabotage PSB's business in New York by soliciting PSB's most significant clients and servicing them through a new and competing company, Insights & Strategies, formed by Markel (while still employed by PSB) with, upon information and belief, assistance and funding from Berland, all in direct contravention of restrictive covenants entered by each of the Individual Defendants and in violation of duties owed by the Individual Defendants to PSB.

2.     In October 2001, Berland and two others sold their stock and all of the assets of certain companies they owned by executing a purchase agreement with PSB's predecessor (the "Purchase Agreement").    Berland received almost $16 million in consideration for such purchase. In connection with the Purchase Agreement and as a condition thereof, Berland entered into a Non-Competition Agreement (the "Berland Non-Competition Agreement"), as well as an Employment Agreement (the "Berland Employment Agreement"), which prohibited Berland from competing with PSB until December 31, 2007, and from soliciting any PSB clients and/or PSB employees or rendering services for any PSB client until December 31, 2008.

3.     Berland left PSB in December 2006, after his final earn out payment, and immediately thereafter Markel founded Insights & Strategies (while Markel was still employed by PSB).  Upon information and belief, Berland was funding and assisting Markel in setting up this competing enterprise.  Indeed, Markel began operating Insights & Strategies

2

before he resigned from PSB and was, upon information and belief, assisted by Berland at this time.

4.    Markel resigned from his employment with PSB on April 6, 2007, and officially assumed the position of President of Insights & Strategies.  Shortly after Markel resigned, Bissell resigned from her employment with PSB on May 9, 2007. Negrin had terminated her employment with PSB on June 2, 2006. Markel, Bissell and Negrin had all executed Confidentiality and Non-Competition Agreements with PSB (the "Non-Competition Agreements") which, among other things, prohibit them from servicing or soliciting any PSB client with respect to any service that is the same as or similar to that provided by PSB, for a period of one year after their employment with PSB terminates.

5.    Berland has blatantly violated the Berland Non-Competition Agreement and the Berland Employment Agreement and has breached fiduciary duties owed to PSB as a result of his actions working with and sending PSB clients to a company that competes with PSB and soliciting and servicing PSB clients through this company (or convincing such clients to reduce the business they did with PSB).  Berland, as well as the other Individual Defendants, are currently soliciting and/or servicing PSB's biggest clients, including National Hockey League ("NHL"), Estee Lauder, Qwest, RIM and Electronic Arts, in violation of their respective Non-Competition Agreements and in breach of their duties of loyalty to PSB.  All Defendants are thereby unfairly competing with PSB and tortiously interfering with PSB's client contracts.

3

6.     As a result of these actions, PSB seeks: (1) temporary, preliminary and permanent injunctive relief: (a) restraining Berland from breaching his restrictive covenants that he signed in connection with the sale of his business and from competing with PSB and/or from soliciting, servicing or accepting business from any client of PSB until the expiration of his restrictive covenants; (b) restraining the remaining Individual Defendants from servicing or soliciting any client of PSB for the one year periods after their respective termination dates; and (c) restraining all Defendants from unfairly competing with PSB and/or from tortiously interfering with PSB's client contracts; (2) an order requiring Berland to return to PSB $11,170,242, representing the payments made to Berland as consideration in connection with the Purchase Agreement (less the amount paid to him upon closing), which amount Berland is required by the Purchase Agreement to return as a result of his breaches; (3) awarding compensatory and punitive damages as a result of Defendants' actions to PSB, along with costs, disbursements and attorneys fees and such other and further relief the Court deems proper.

## THE PARTIES

7.     Plaintiff PSB is a Delaware limited liability corporation with its principal place of business at 1110 Vermont Avenue, NW, Suite 1200, Washington DC 20005.

8.     Defendant Michael J. Berland is a former employee of PSB and, upon information and belief, a founder of Insights & Strategies, residing at 27 School House Road,

4

#15, Waccabuc, New York 10597.

9.     Defendant Mitchell E. Markell is a former employee of PSB and, upon information and belief, a founder of Insights & Strategies, residing at 235 E. 95th Street, Apt. 8, New York, New York 10128.

10.     Defendant Julie Bissell is a former employee of PSB who, upon information and belief, resides at 60 Broadway, Apt. 3M, Brooklyn, New York 11211.

11.     Defendant Jennifer Negrin is a former employee of PSB, who, upon information and belief, resides at 40 Highview Avenue, Old Greenwich, CT 06870.

12.     Upon information and belief, Insights & Strategies, LLC is a New York limited liability corporation formed on January 18, 2007, with its principal place of business in New York, New York.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1332 as there is diversity of citizenship between the parties and the amount in controversy exceeds $75,000, excluding interest and costs.

14.     Venue is proper in this District under 28 U.S.C. § 1391.

**BACKGROUND**

**BERLAND AND TWO OTHERS SELL THEIR**
**SHARES AND ASSETS OF COMPANIES THEY FOUNDED**

15.    Berland, along with Mark Penn ("Penn") and Douglas Schoen ("Schoen"), owned Penn, Schoen & Berland Associates, Inc. ("PSB Associates"), a company in the business of market research and polling.

16.    On or about October 17, 2001, PSB's predecessor, PSB Acquisition Corp. ("PSB Acquisition"), entered into an agreement to acquire 100% of the capital stock of PSB Associates and substantially all of the assets and ongoing business of two related companies: Neuro Corp. ("Neuro") (owned by Penn and Berland) and PSA Interviewing Denver, Inc. ("PSA Denver") (owned by Penn and Schoen) (together with PSB Associates, the "Companies").

17.    The assets purchased by PSB Acquisition from Neuro and PSA Denver (the "Assets") included, among other things, the Companies' current and prospective client list, all of their existing contracts and agreements with clients and the right to service such clients.

18.    Berland received $15,519,492 as consideration in connection with the Purchase Agreement.

6

19.    Pursuant to the Purchase Agreement, Berland was required to enter into the Berland Employment Agreement and the Berland Non-Competition Agreement, both of which had very specific restrictive covenants.

20.    Section 3.3(i) of the Purchase Agreement demonstrates the importance of the restrictive covenants in the Berland Employment Agreement and the Berland Non-Competition Agreement because it provides that in the event that Berland violates the restrictive covenants under his Non-Competition Agreement or violates the non-competition agreements contained in his Employment Agreement, PSB Acquisition has the right to require Berland to repay PSB Acquisition all advances and purchase price payments previously paid or distributed to him (except the payment made in connection with the closing) pursuant to the Purchase Agreement.

21.    Berland expressly confirmed and agreed that the provisions of Section 3.3 had been fully negotiated and that such provision constituted a material inducement to PSB Acquisition consummating the transactions contemplated by the Purchase Agreement.

22.    On November 16, 2001, PSB Associates was merged with and into PSB Acquisition, and the resulting combined business unit became known as Penn, Schoen & Berland Associates, Inc.  On December 30, 2005, Penn, Schoen & Berland Associates, Inc. was converted into a Delaware limited liability company and re-named Penn, Schoen & Berland Associates, LLC (previously defined as the Plaintiff, "PSB").

7

**Berland's Employment and Non-Competition Agreements**

        23.    Berland entered into the Berland Employment Agreement and the Berland Non-Competition Agreement on November 15, 2001. The Berland Non-Competition Agreement provides that Berland will not compete in any way with PSB until December 31, 2007:

> [A]s an inducement to [PSB Acquisition] entering into the Purchase Agreement and consummating the transactions contemplated by the Purchase Agreement, and in consideration of payments and benefits received or to be received by the undersigned, the undersigned hereby covenants and agrees that from the date hereof through December 31, 2007 (the "Non-Compete Period"), he will not engage in business as, or own an interest in, directly or indirectly, any individual proprietorship, partnership, corporation, joint venture, or any other form of business entity, whether as an individual proprietor, partner, shareholder, joint venturer, officer, director, consultant, finder, broker, employee, or in any other manner whatsoever (except on behalf of [PSB Acquisition, the Companies, and any subsidiaries and divisions of PSB Acquisition and the Companies (collectively, the "Company")]), if such entity is engaged in whole or in part in any business in the United States of the type and character engaged in and competitive with that conducted by the Company; provided, however, nothing contained in this paragraph shall be deemed to prohibit the undersigned from owning 1% or less of the shares of a publicly held corporation engaged in any such business.

Berland's Non-Competition Agreement further prohibits Berland from soliciting or servicing any PSB client (as defined in the PSB Non-Competition Agreement) and/or soliciting for hire any PSB employee:

> In addition to the foregoing, the undersigned hereby covenants and agrees that from the date hereof through

December 31, 2008 (the "Restricted Period"), he will not, except on behalf of the Company, directly or indirectly:

(1)    attempt in any manner to solicit from any client business of the type performed by the Company or to persuade any client to cease to do business with the Company or to reduce the amount of business which any such client has customarily done or is reasonably expected to do with the Company, whether or not the relationship between the Company and such client was originally established in whole or in part through his efforts; or

(2)    employ (including to retain, engage or conduct business with) or attempt to employ or assist anyone else to employ any person who is then or at any time during the preceding year was an employee of or consultant to the Company; provided, however, that (i) the undersigned shall be permitted to conduct business with any other Principal so long as none of such Principals (including the undersigned) is, or will be by conducting such business, in violation of their respective Employment Agreements with the Company or their respective Non-Competition Agreements delivered to the Company at the Closing and (ii) the undersigned shall not be prohibited from providing employment references upon request (without solicitation) on behalf of any person who is then or at any time during the preceding year was an employee of or consultant to the Company; or

(3)    render to or for any client any services of the type rendered by the Company.

24.    Berland's Employment Agreement includes an almost identically-worded covenant which runs for a two-year period after the date of termination of his employment.

9

**PSB Hires Mitchell Markel, Jennifer Negrin, and Julie Bissell and These Individuals Enter Into Non-Competition Agreements**

25.    On or about January 6, 1997, PSB hired Markel as an entry-level analyst.

26.    On or about June 8, 2000, PSB hired Bissell as an entry-level analyst.

27.    On October 3, 2001, PSB hired Negrin as a Vice President.

28.    As employees of PSB, Markel, Bissell, and Negrin were each required and in fact did sign Confidentiality & Non-Competition Agreements (the "Non-Competition Agreements") upon commencement of employment with PSB.

29.    Under the terms of the Confidentiality & Non-Competition Agreement, Markel, Bissell and Negrin promised and agreed to keep certain information of PSB confidential, including but not limited to PSB's client information (lists of clients, lists of prospective clients, client names, addresses, and background, client data bases, etc.).  In addition, Markel, Bissell and Negrin also promised and agreed that for a period of one year after his/her employment with PSB terminates, s/he will not directly or indirectly service or solicit any client (as defined in the Non-Competition Agreements) of PSB with respect to any service that is the same as or similar to that provided by PSB.

30.    Each Employee also signed an Acknowledgement acknowledging that s/he had received and understood PSB's Employee Handbook (the "Employee

Handbook") and agreed to honor its terms and expectations. The terms of the Non-Competition Agreements are reiterated on page four of the Employee Handbook.

## Berland and the Other Individual Defendants Leave PSB

31.    Berland's Employment Agreement expired at the end of 2006. Berland chose not to renew his Employment Agreement and resigned from his employment with PSB on December 31, 2006.

32.    The other Individual Defendants also left PSB. Markel's last day at PSB was April 6, 2007. At the time of Markel's departure from PSB, he had reached the position of Vice President. Bissell's last day was May 9, 2007. At the time of Bissell's departure, she, too, had reached the position of Vice President. Negrin had left approximately one year prior to the departures of Markel and Bissell, on June 2, 2006.

## Markel and Berland Create a New Company Global Insights & Strategies, LLC

33.    Berland and Markel are currently working together and engaging in business of the type and character engaged in and competitive with PSB in breach of their restrictive covenants.

34.    Upon information and belief, before terminating his employment with PSB and before the expiration of his restrictive covenants, Berland began the process of forming a competitive business with Markel, called Global Insights & Strategies, LLC.

11

35.    Insights & Strategies' website, insightsandstrategies.com, was registered on December 21, 2006, immediately prior to Berland's resignation from PSB, but while Markel was still employed by PSB.  Insights & Strategies was formed on January 18, 2007, and Markel is the primary person associated with this company. Markel was still employed by PSB at this time.

36.    Markel began operating the business of Insights & Strategies as early March 22, 2007, while still employed by PSB, communicating at that time with an insightsandstragies e-mail address.

37.    Just two days after he resigned from PSB, on April 8, 2007, Markel was communicating with Negrin, who was by then employed by a new employer, Connell & Associates, a competitor of PSB.  Markel was touting his new business, Insights & Strategies. Specifically, when Negrin sent Markel an e-mail complaining about the quality of work provided to her by someone from PSB.  Markel responded, "That's why global insights and strategies (my new company) will be a success – because I will do good quality quant [research.]  I'd totally screw tom [the current Managing Director of PSB's New York office] over and refuse to pay." At this time and for the year after his termination date of April 6, 2007, Markel's conduct was limited by the restrictive covenants in his Non-Competition Agreement.

**Berland and Markel Conduct Business with RIM and NHL**

38.    Insights & Strategies is currently servicing two clients of PSB (as that term is defined in the Non-Competition Agreements and the Berland Employment Agreement), RIM (the maker of Blackberries) and the National Hockey League ("NHL").

39.    Berland and Markel are currently actively involved in brainstorming sessions and focus groups on behalf of RIM. Specifically, just days prior to the filing of the Complaint, PSB discovered that Berland, Markel and Berland's wife, Marcela Berland ("Marcela") were setting up focus groups with an executive at RIM. The email correspondence on June 11, 2007, between and among these individuals, shows that Markel and, upon information and belief, Berland will travel to conduct these focus groups which are scheduled to occur the week of the filing of this Complaint.

40.    Additional e-mail correspondence corroborates that Markel and Berland are now actively servicing PSB's client RIM. Later in the day on June 11, Marcela congratulated Markel and Berland by sending an e-mail with the subject line "congrats!" She wrote, "We are on with bb [Blackberry, RIM's product] . . . thanks mike. I am in cc now, but let's discuss next steps. Can u send me last version of screener?" Thereafter, Marcela wrote an e-mail to Markel and Berland acknowledging that both Markel and Berland together would be moderating the RIM focus groups and working with Marcela's employer to prepare guidelines and questionnaires for the focus groups. A later e-mail shows that Markel created a draft of the guide that would be used at the

13

focus groups and that he circulated it to, among others, Berland and Marcela for comments.

41.    Since their departures from PSB, Berland and Markel have also been working with NHL, another PSB client, on questionnaires, polling, and segmentation analyses, which are the exact types of services that PSB is in the business of providing. Moreover, e-mail correspondence shows that Berland and Markel are using the services and expertise of a current employee of PSB, Oleg Urminsky ("Urminsky"), to support their new business.    Specifically, on May 21, 2007, Berland sent an e-mail titled "Excellent meeting" to an Executive Vice President at NHL asking her to send him questionnaires and reports.    When the NHL complied and sent the questionnaire (indicating reports would follow), Berland forwarded the materials to Markel, who then forwarded them to Urminsky, who is a current employee and staff statistician at PSB.

42.    Thereafter, on May 22, 2007, an individual named Terence Rooke from an outside company sent a segmentation report regarding the NHL to Berland. Berland forwarded the report to Markel, who then forwarded the report to Urminsky.

43.    Then, on May 29, 2007, an employee of the NHL forwarded Berland what appears to be a bid for some work for NHL.    Berland forwarded this report to Markel and asked him if he had time to look at the report.    Markel responded that he did.

44.    On May 31, 2007, Berland received another segmentation report for the NHL from a competitor of PSB.    The e-mail indicates that Berland worked on the

14

report and gave advice regarding "a behavioral segmentation approach" and the variables for a segmentation analysis. Berland forwarded this to Markel.

45.    More recently, on June 2, 2007, Berland e-mailed Markel, "we need to get NHL document done this weekend. You guys want to come to a BBQ with FOOD tomorrow at 1PM." Markel responded, "Going to mets game tomorrow."

46.    On June 7, 2007, Markel e-mailed Berland talking about the "next wave of nhl polling."

## Markel, Negrin and Bissell Conduct Business for Estee Lauder

47.    Markel, Negrin, and Bissell are all working together on Estee Lauder Inc. ("Estee Lauder"), another PSB client. Specifically, on May 21, 2007, Negrin e-mailed Markel and copied Bissell reminding Markel that she needed a "detailed timeline for the Estee project" that morning. Markel responded that he would comply.

48.    Later on the same day, a co-employee of Negrin e-mailed Markel and copied Negrin and Bissell asking questions about Estee Lauder and discussing certain issues that are going to be important to Estee Lauder. The next day, May 22, 2007, Markel e-mailed a third party a questionnaire for "the Estee Lauder study currently in the field," asking that individual to do some processing with respect to the questionnaire. Then, on May 23, 2007, Bissell e-mailed Markel, Negrin and Negrin's co-employee with questions about the "script output" [the method used in the industry by which we determine if the questions of a survey have been asked in the proper order and

programmed correctly into the computers] for Estee Lauder. Markel forwarded this e-mail chain to Berland. More recently, on May 29, 2007, Negrin's co-employee e-mailed Markel and copied Bissell and Negrin advising that she spoke to someone at Estee Lauder and that the person had questions and instructions. Markel agreed to work on the issues later that evening.

**Markel Solicits Business from Qwest and Electronic Arts**

49.     Markel is also attempting to solicit business from Qwest Communications International, Inc. ("Qwest") and Electronic Arts ("EA"), also current clients of PSB.

50.     On May 23, 2007, Markel e-mailed a former PSB employee who started a market research firm in Denver thanking him for his help with an Estee Lauder survey (also a PSB client) and indicating that he would "love to get involved" with Qwest business.   Thereafter, on May 30, 2007, Markel received an e-mail from another employee at the Denver firm asking if Markel had time to "chat . . . about Qwest." Markel responded by setting up a time for such chat. Within two weeks, on June 11, 2007, Markel sent an email to a Qwest employee to set up a meeting in Denver.

51.     On the same day of this e-mail correspondence, Qwest called PSB to cancel approximately $500,000 of business that was in the pipeline.

52.     Upon information and belief, Markel has either already met with Electronic Arts or is attempting to set up a meeting with Electronic Arts.

16

**PSB's Business with the Clients**

53.    From inception to date, PSB has generated almost $10 million of revenues from work done for Electronic Arts, Qwest, RIM, Estee Lauder, and NHL (the "Clients").

54.    The Individual Employees worked on all the Clients, with the exception of Electronic Arts, while they were in the employ of PSB.  None of Berland, Markel, Bissell or Negrin are responsible for bringing the Clients to PSB.

**COUNT ONE**
**AS TO DEFENDANT BERLAND**
**(BREACH OF CONTRACT (NON-COMPETITION AGREEMENT))**

55.    PSB   repeats and realleges the allegations contained in paragraphs 1 through 54 as if fully set forth herein.

56.    The Berland Non-Competition Agreement entered into between PSB Acquisition Corp. (the predecessor to PSB) and Berland on November 15, 2001 is valid and enforceable.

57.    PSB, as successor to PSB Acquisition Corp., has performed its obligations under the Berland Non-Competition Agreement.

58.    Berland has breached his obligations under the Berland Non-Competition Agreement by engaging in a business "of the type and character engaged in and competitive with that conducted by [PSB]" and by providing services that compete with PSB.

59.    Berland has breached his obligations under the Berland Non-Competition Agreement by soliciting and servicing PSB's clients on behalf of himself and Insights & Strategies.

60.    PSB has suffered and will continue to suffer irreparable injury and monetary damages as a direct and proximate result of Berland's breach of the Berland Non-Competition Agreement.

**COUNT TWO**
**AS TO DEFENDANT BERLAND**
**(BREACH OF CONTRACT (EMPLOYMENT AGREEMENT))**

61.    PSB   repeats and realleges the allegations contained in paragraphs 1 through 60 as if fully set forth herein.

62.    The Berland Employment Agreement entered into between PSB Acquisition Corp. (the predecessor to PSB) and Berland on November 15, 2001 is valid and enforceable.

63.    PSB, as successor to PSB Acquisition Corp., has performed its obligations under the Berland Employment Agreement.

64.    Berland has breached his obligations under the Berland Employment Agreement by soliciting and servicing PSB's clients on behalf of himself and Insights & Strategies.

65.    PSB has suffered and will continue to suffer irreparable injury and monetary damages as a direct and proximate result of Berland's breach of the Berland Employment Agreement.

## COUNT THREE
## AS TO DEFENDANT MARKEL
## (BREACH OF CONTRACT (NON-COMPETITION AGREEMENT))

66.    PSB   repeats and realleges the allegations contained in paragraphs 1 through 65 as if fully set forth herein.

67.    Markel's Non-Competition Agreement entered into between PSB and Markel on January 27, 2003 is valid and enforceable.

68.    PSB has performed its obligations under Markel's Non-Competition Agreement.

69.    Markel has breached his obligations under his Non-Competition Agreement by soliciting and servicing PSB's clients on behalf of himself and Insights & Strategies.

70.    PSB has suffered and will continue to suffer irreparable injury and monetary damages as a direct and proximate result of Markel's breach of Markel's Non-Competition Agreement.

## COUNT FOUR
## AS TO DEFENDANT BISSELL
## (BREACH OF CONTRACT (NON-COMPETITION AGREEMENT))

71.    PSB   repeats and realleges the allegations contained in paragraphs 1 through 70 as if fully set forth herein.

72.    Bissell's Non-Competition Agreement entered into between PSB and Markel on June 9, 2000 is valid and enforceable.

73.    PSB has performed its obligations under Bissell's Non-Competition Agreement.

19

74.    Bissell has breached her obligations under her Non-Competition Agreement by soliciting and servicing PSB's clients on behalf of herself and Insights & Strategies.

75.    PSB has suffered and will continue to suffer irreparable injury and monetary damages as a direct and proximate result of Bissell's breach of her Non-Competition Agreement.

## COUNT FIVE
## AS TO DEFENDANT NEGRIN
## (BREACH OF CONTRACT (NON-COMPETITION AGREEMENT))

76.    PSB repeats and realleges the allegations contained in paragraphs 1 through 75 as if fully set forth herein.

77.    Negrin's Non-Competition Agreement entered into between PSB and Negrin on July 19, 2004 is valid and enforceable.

78.    PSB has performed its obligations under Negrin's Non-Competition Agreement.

79.    Negrin has breached her obligations under her Non-Competition Agreement by soliciting and servicing PSB's clients on behalf of herself and Insights & Strategies.

80.    PSB has suffered and will continue to suffer irreparable injury and monetary damages as a direct and proximate result of Negrin's breach of her Non-Competition Agreement.

20

## COUNT SIX
## AS TO DEFENDANT BERLAND
## (TORTIOUS INTERFERENCE WITH CONTRACT)

81.    PSB  repeats and realleges the allegations contained in paragraphs 1 through 80 as if fully set forth herein.

82.    Berland had knowledge of Markel's contractual commitments to PSB in the form of Markel's Non-Competition Agreement.

83.    Despite his knowledge of Markel's contractual commitments to PSB, Berland has induced Markel to violate the terms of Markel's Non-Competition Agreement with PSB.

84.    PSB has suffered and will continue to suffer irreparable injury and monetary damages as a direct and proximate result of Berland's actions.

85.    Berland's actions were intentional, willful, outrageous and malicious, and justify the imposition of punitive damages.

## COUNT SEVEN
## AS TO THE INDIVIDUAL DEFENDANTS
## (TORTIOUS INTERFERENCE WITH CONTRACT)

86.    PSB  repeats and realleges the allegations contained in paragraphs 1 through 85 as if fully set forth herein.

87.    PSB has valid and binding agreements for commissioned work with its clients, including but not limited to NHL, Estee Lauder, Qwest and RIM (the "Client Agreements").

21

88.    The Individual Defendants had knowledge of the Client Agreements.

89.    The Individual Defendants intentionally and without justification caused PSB's clients to breach the Client Agreements, as detailed above.

90.    PSB has suffered and will continue to suffer irreparable injury and monetary damages as a direct and proximate result of the actions of the Individual Defendants.

91.    The Individual Defendants' actions were intentional, willful, outrageous and malicious, and justify the imposition of punitive damages.

## COUNT EIGHT
### AS TO THE INDIVIDUAL DEFENDANTS
### (BREACH OF FIDUCIARY DUTY AND DUTY OF LOYALTY)

92.    PSB  repeats and realleges the allegations contained in paragraphs 1 through 91 as if fully set forth herein.

93.    Berland was employed in a senior position by PSB until his employment terminated in December 2006. As such, Berland owed PSB the fiduciary duty to act at all times in the utmost good faith and in PSB's best interests.

94.    Markel, Bissell and Negrin were employees of PSB. As such, Markel, Bissell and Negrin owed PSB the common-law duty to act at all times in the utmost good faith and in PSB's best interests

95.    While still employed and receiving compensation from PSB, the Individual Defendants breached their duties to PSB by: (a) soliciting each other to form a competing enterprise; (b) soliciting and/or servicing PSB clients and/or or inducing those

22

clients to cease or reduce the amount of business they did with PSB; and (c) soliciting and/or securing the employment of several PSB employees on behalf of Insights & Strategies.

96.    Such conduct constitutes breaches of the Individual Defendants' common law duties of loyalty to HSC.

97.    As a result of the Individual Defendants' breaches of their duty of loyalty, PSB has suffered and will continue to suffer irreparable injury, in addition to monetary damages.

98.    Due to the Individual Defendants' willful and wanton misconduct, PSB is entitled to an award of punitive damages.

## COUNT NINE
## AS TO THE DEFENDANTS
## UNFAIR COMPETITION

99.    PSB    repeats and realleges the allegations contained in paragraphs 1 through 98 as if fully set forth herein.

100.    As fully described above, Defendants have unfairly competed with PSB by soliciting and servicing PSB's clients and by soliciting and/or hiring PSB employees on behalf of Insights & Strategies.

101.    As a direct and proximate result of Defendants' misconduct, PSB has suffered and will continue to suffer irreparable injury, in addition to monetary damages.

102.    Due to Defendants' willful and wanton misconduct, PSB is entitled to an award of punitive damages.

## COUNT TEN
## AS TO DEFENDANT BERLAND
## BREACH OF CONTRACT

114.    PSB repeats and realleges the allegations contained in paragraphs 1 through 113 as if fully set forth herein.

115.    By express provision of the Purchase Agreement, Berland agreed to return all monies paid to him in connection with the Purchase Agreement, including all advances and purchase price payments, if he violated the restrictive covenants in the Berland Non-Competition Agreement or the Berland Employment Agreement.

116.    By virtue of his actions alleged above, Berland has breached the Berland Non-Competition Agreement and the Berland Employment Agreement.

117.    Accordingly, in addition to the remedies set forth herein, by the express provisions of the Purchase Agreement, PSB is entitled to the a return of the monies paid to Berland in connection with the Purchase Agreement (less the payment made to him at closing), a total of $11,170,242.

**WHEREFORE,** plaintiff PSB demands judgment against Defendants as follows:

(A)    immediately and permanently enjoining Berland from engaging in business or owning an interest in a business that conducts market research and polling until December 31, 2007;

(B)    immediately and permanently enjoining Berland from soliciting, servicing or accepting business from any client of PSB, including but not limited to NHL, Estee Lauder, Qwest and RIM, until December 31, 2008;

(C)    immediately and permanently enjoining Berland from soliciting or hiring any individual currently employed by PSB;

24

(D)     immediately and permanently enjoining Markel, Bissell and Negrin from servicing or soliciting any client of PSB for the one year period following these individuals' respective termination dates;

(E)     immediately and permanently enjoining Insights & Strategies from unfairly competing with PSB and from servicing or soliciting any client of PSB and/or from soliciting or hiring any individual currently employed by PSB;

(F)     awarding PSB compensatory damages against all Defendants in an amount to be determined at trial;

(G)     ordering Berland to return to PSB $11,170,242, in consideration paid to Berland in connection with the Purchase Agreement

(H)     awarding PSB punitive damages in an amount to be determined at trial;

(I)     awarding PSB attorneys' fees and costs of suit; and

(J)     granting such other and further relief as the Court deems just and proper.


Dated: June 13, 2007

DAVIS & GILBERT, LLP

By: _____
    Howard J. Rubin, Esq.
    Jennifer Tafet Klausner, Esq.
    Allie Lin, Esq.
  1740 Broadway
  New York, New York 10019
  (212) 468-4800

25